**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

**DAWN LAWREY, Mother and Next Friend of AUBREE LAWREY, A Minor,**

**Plaintiffs,**

**v.**

**KEARNEY CLINIC, P.C., and DAWN M. MURRAY, M.D.,**

**Defendants.**

**CASE NO. 8:11-CV-00063**

**BRIEF IN SUPPORT OF DEFENDANTS KEARNEY CLINIC, P.C. AND DAWN M. MURRAY, M.D.'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS**

Defendants Kearney Clinic, P.C., and Dawn M. Murray, M.D., respectfully submit this brief in support of their motion to exclude testimony of Plaintiffs' experts Scott Kozin, M.D., and Amos Grunebaum, M.D.

## INTRODUCTION

Plaintiffs filed this medical malpractice action against the Defendants alleging that the Defendants deviated from the standard of care in rendering professional medical services in connection with the birth of Aubree Lawrey. In support of their claim for damages, Plaintiffs offer the testimony of Dr. Scott Kozin, an orthopedic surgeon, and Dr. Amos Grunbaum, an OB/GYN. In their respective reports, Plaintiffs' experts opine that the maternal expulsive forces of labor do not cause permanent brachial plexus injuries, and that substantial injury to the brachial plexus can only happen when excessive traction is used by the delivering clinician. Plaintiffs' experts should be precluded from testifying with regard to these opinions at trial because their testimony lacks the scientific reliability and validity required by Rule 702 of the Federal Rules of Evidence. Furthermore, as an orthopedic surgeon, Plaintiffs' expert Dr. Kozin is not qualified to testify with regard to the etiologies of brachial plexus birth injuries as they

occur during labor. Finally, Plaintiffs' experts' theory that maternal expulsive forces do not cause permanent brachial plexus injury, and that such injury is always the result of physician-applied traction, does not fit the facts or the issues in this case and thus advances no issue in this litigation.

**STATEMENT OF FACTS**

1. Plaintiff Dawn Lawrey gave birth to Aubree Lawrey at Good Samaritan Hospital in Kearney, Nebraska, on March 1, 2008. (Doc. # 45-2, Dep. of D. Lawrey, 37:19-25); (Doc. #1, ¶ 8).

2. Defendant Dawn M. Murray, M.D. ("Dr. Murray") was the attending physician who delivered Aubree Lawrey. (Doc. # 45-2, Dep. of D. Lawrey, 27:1-22, 44:1-6).

3. Dawn Lawrey was scheduled for an induction of labor for suspected macrosomia (excessive fetal birth weight) based on an ultrasound conducted on February 21, 2008. The ultrasound had shown fetal growth to be approximately 8 days ahead of the clinical due date. The estimated fetal weight at that time was 9 lbs 15 oz. (Exhibit 1, Aff. of Aldridge Ex. A, Dep. of Dr. Murray (hereinafter "Dep. of Dr. Murray) 43:18-22); (Doc. # 45-2, Dep. of D. Lawrey 34:4-11).

4. After receiving the ultrasound results, Dr. Murray spoke with Dawn Lawrey and discussed the option of a cesarean section. Dawn Lawrey opted for a trial of labor, which was acceptable to Dr. Murray. (Dep. of Dr. Murray 46:16-19, 47:23-35, 48:1-4).

5. Dr. Murray testified in her deposition that Aubree was delivered without difficulty after just minimal pushing. (Dep. of Dr. Murray 22:10-22).

6. As soon as Aubree was delivered, it was evident that her right arm was

somewhat flaccid and was not moving. (Dep. of Dr. Murray 23:7-10); (Doc. # 45-2, Dep. of D. Lawrey, 51:24-25, 52:1-2); (Exhibit 3, Dec. of Dr. Grimm Ex. A, Report of Dr. Grimm (hereinafter "Report of Dr. Grimm") p. 2).

7. It was eventually determined that Aubree had sustained a brachial plexus injury. (Doc. # 45-2, Dep. of D. Lawrey, 53:10-14); (Doc. # 45-3, Dep. of J. Lawrey 22:9-15); (Report of Dr. Grimm, p. 2).

8. The brachial plexus is a complex of nerves that typically originate from the anterior rami of the final four cervical nerves (C5 to C8) and the first thoracic nerve (T1) as they exit the spinal cord. It extends from the spinal cord in the lower portion of the neck to the axilla (armpit region) and into the arm.




(Dec. of Grimm Ex. B, Grimm and Costello Article (hereinafter "Grimm and Costello Article") p. 94-95).

9. The brachial plexus is responsible for cutaneous and muscular innervation of the upper limb. The location of the brachial plexus in the neck and shoulder region places it

at risk of injury due to various sources of trauma. Because the brachial plexus in anchored between the neck and the more distal regions of the upper extremity, the extensive range of motion of the neck provides the opportunity for significant stretching of the nerve. (Grimm and Costello Article, p. 95).

10. In infants, brachial plexus injuries are often associated with a shoulder dystocia. This can occur when either the anterior (with respect to the mother) shoulder of the infant gets lodged behind the symphisis pubus, or when the posterior shoulder settles into the hollow of the sacrum or is obstructed by the sacral promontory. (Grimm and Costello Article, p. 99).

11. In cases of anterior shoulder dystocia, the maternal forces pushing the baby forward are stopped when the anterior should impacts the symphisis pubus of the maternal pelvis. In order to relieve the impaction, the clinician generally employs a series of maneuvers designed to shift the location of the shoulder from behind the symphisis pubus and allow the delivery to occur with normal maternal and attendant-applied forces. (Grimm and Costello Article p. 99).

12. Brachial plexus injuries also occur in the posterior shoulder—both without a shoulder dystocia and in cases when the anterior shoulder has become impacted on the maternal pelvis. (Grimm and Costello Article p. 99); (Exhibit 2, Aff. of Robert Demott Ex. B, Report of Dr. DeMott (hereinafter “Report of Dr. Demott”) p. 4).

13. When Aubree Lawrey was born, she was noted to be in the right occiput anterior (“ROA”) position at the time her head delivered, indicating that her right shoulder would have been posterior. (Ex. 2, Aff. of DeMott, ¶ 8).

14. Dr. Murray describes in her deposition that she does not believe that the anterior (left) shoulder engaged the symphisis pubis during the delivery, as the head and body delivered in one motion. (Dep. of Dr. Murray 25:4-10, 59:2-21).

15. In her deposition, Dr. Murray testified that she believed there was a posterior shoulder dystocia of the posterior arm on the sacral promontory that occurred sometime before her hands-on delivery, and that the forces of labor while the shoulder was stuck caused the brachial plexus to stretch and become injured. (Dep. of Dr. Murray 23:19-21, 24:1-18).

16. Plaintiffs have identified Dr. Amos Grunebaum, an OB/GYN, in support of their medical malpractice claims against Defendants. (Doc. # 54-1 – 54-3).

17. Dr. Grunebaum states in his expert report that "Dr. Murray applied excessive traction to the fetal head in the presence of a shoulder dystocia resulting in permanent brachial plexus injury to the child" and that "substantial injury to all nerves of the brachial plexus as occurred in this case can only happen when excessive traction is used by the delivery medical person." (Doc. #54-1, p. 3).

18. Dr. Grunebaum testified during his deposition that temporary brachial plexus injuries can occur in the posterior arm without excessive traction from the birth attendant. (Ex. 1, Aff. of Aldridge Ex. B, Dep. of Grunebaum (hereinafter "Dep. of Grunebaum") 63:16-22).

19. Dr. Grunbaum acknowledged that he does not know what the mechanism is that causes these temporary injuries to the posterior arm when there is no excessive physician-applied traction. (Dep. of Grunbaum 63:23-25).

20. Dr. Grunebaum testified that he knows of no evidence other than anecdotal evidence to support his theory that permanent injuries cannot occur in the posterior arm without excessive physician traction. (Dep. of Grunebaum 77:14-18).

21. Dr. Grunebaum testified that the severity of Aubree Lawrey's injury was the only evidence he could point to indicating excessive traction was used. (Dep. of Grunebaum 62:10-16).

22. Plaintiffs have also identified Dr. Scott Kozin, an orthopedic surgeon, in support of their medical malpractice claims against Defendants. (Doc. # 54-3 – 54-6).

23. In Dr. Kozin's expert report, he states that he will testify that "the mother's maternal forces are very suspect as a cause of permanent brachial plexus injury and that permanent brachial plexus injuries are not caused by those forces." Dr. Kozin also states that he will testify that "the lateral movement sufficient to produce the permanent brachial plexus injury that Aubree Lawrey suffered can only happen after the head is delivered." (Doc. # 54-4, pp. 5, 6).

24. Dr. Kozin is not an expert in obstetrics and does not understand the physiology of child labor. (Ex. 1, Aff. of Aldridge Ex. D, Dep. of Kozin (hereinafter "Dep. of Kozin") 19:19-22).

25. Dr. Kozin has never written anything in the medical literature regarding his opinion that only lateral traction, as opposed to axial traction, can cause brachial plexus injury. (Dep. of Kozin 20:4-9).

26. Dr. Kozin does not have any expertise with regards to the movements that the fetus makes while traversing down the birth canal. (Dep. of Kozin 19:23-25, 20:1-3).

27. Dr. Kozin does not consider himself an expert on whether obstetrical forces and movements of the fetus in labor down the birth canal can widen the angle between the shoulder and the spine, and has never published or written an opinion on that subject. (Dep. of Kozin 22:11-22, 23:1-14).

28. Dr. Kozin admitted that if the fetus's shoulder of a fetus gets impinged or "stuck" while moving down the birth canal causing the angel between the shoulder and spine to widen substantially, a brachial plexus injury can result. (Dep. of Kozin 24:21-25, 25:1-10).

29. Dr. Kozin admitted that brachial plexus injuries can occur when the baby traverses the sacral promontory. (Dep. of Kozin 42:8-10).

30. Dr. Kozin's expert report was actually authored by Plaintiffs' attorney, Kenneth Levine, and Dr. Kozin did not make any changes to the report that Mr. Levine sent him to sign. (Dep. of Kozin 29:17-25, 30:1-4).

31. Dr. Kozin does not know the degree of variation in the tensile strength of nerves of the brachial plexus in different fetuses. (Dep. of Kozin 34:10-19).

32. Dr. Kozin acknowledged that compression of the brachial plexus while a fetus is in utero can damage the nerve, but testified that he has "no idea" whether a brachial plexus that is compressed in utero without traction becomes more susceptible to injury during the normal traction of labor. (Dep. of Kozin 35:21-25, 36:1-19).

33. Dr. Kozin testified that he has not formed any conclusion as to whether the arm that was injured in this case was in the posterior or anterior position during delivery. (Dep. of Kozin 41:5-9).

34. Dr. Kozin acknowledges that brachial plexus injuries to the posterior arm of a fetus can occur when the posterior arm gets impinged on the sacral promontory of the mother. (Dep. of Kozin 41:14-25, 42:1-10).

35. Dr. Kozin testified during his deposition that he does not know, and is not qualified to opine on, whether the traction that causes brachial plexus injuries can occur as a result of the endogenous force of the maternal propulsive effort with the shoulder impinged on the sacral promontory. (Dep. of Kozin 48:1-13).

36. Dr. Kozin acknowledged that, because he does not know the amount of endogenous force that can be generated by a mother during labor, he cannot say whether enough force can be generated to rupture the nerves of the brachial plexus during the labor process. (Dep. of Kozin 52:9-19, 53:8-13).

37. Dr. Kozin admits that he is not an expert on the subject of whether it is endogenous or exogenous forces that cause the traction that result in injury to the brachial plexus. (Dep. of Kozin 55:11-16).

38. Dr. Kozin admits that there are other causes of birth-related brachial plexus injuries other than obstetrical causes. (Dep. of Kozin 65:16-25).

39. Dr. Kozin acknowledged that he is not aware of any evidence from the materials he reviewed that anyone observed or attests that Dr. Murray used any excessive traction during the delivery of Aubree Lawrey. (Dep. of Kozin 73:15-20).

**STANDARD**

"Proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.

2001) (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Fed. Evid. § 702.02[3] (2001)). First, expert's proposed testimony must be relevant. *Id.* "[E]vidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* Second, the proposed expert witness must be qualified to assist the finder of fact. *Id.* Third, the proposed expert testimony must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.*

Under Federal Rule of Evidence 702, "'a witness qualified as an expert by knowledge, skill, experience, training, or education' may offer opinion testimony if that testimony will 'assist the trier of fact' in determining an issue in the case." *Miles v. Gen. Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001). If a witness is qualified as an expert, the district court still has the obligation to serve as a "gatekeeper" to determine whether an expert's testimony is both relevant and reliable. *Id.* "Put another way, under *Daubert* and *Kumho*, the court must screen proffered expert testimony to determine its *relevance* and its *reliability*. *Ross v. Ford Motor Co.*, No. 7:01CV610, 2003 U.S. Dist. LEXIS 27790, at 13 (D. Neb. July 25, 2003).

In assessing whether a proposed expert satisfies the reliability standard, a court is required to ascertain whether the evidence is "ground[ed] in the methods and procedures of science." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). In *Daubert*, the Supreme Court provided a number of factors for courts to assess when determining the admissibility of an expert's testimony. *Id.* The Eighth Circuit has summarized the factors as follows: "(1) whether the expert's methodology

has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique has been generally accepted in the proper scientific community." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 n. 3 (8th Cir. 2001) (citing *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-1208 (8th Cir. 2000)). The Eighth Circuit has also cited other factors a court may consider in making this determination, including whether the proposed expert ruled out alternative explanations and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Lauzon*, 270 F.3d at 687. This list of factors is not, however, exclusive as the court is allowed "great flexibility" in its analysis. *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th Cir. 1999). Ultimately, "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then the expert testimony must be excluded. *Bonner*, 259 F.3d at 929-30.

## ARGUMENT

### I. PLAINTIFFS' EXPERTS' OPINIONS SHOULD BE EXCLUDED BECAUSE THEY HAVE NO SCIENTIFIC BASIS FOR CONCLUDING THAT PERMANENT BRACHIAL PLEXUS INJURIES ALWAYS RESULT FROM PHYSICIAN-APPLIED TRACTION AND CANNOT OCCUR AS A RESULT OF THE NATURAL FORCES OF LABOR.

The Court should exercise its gatekeeping role in this instance and exclude Plaintiffs' experts' opinion that the natural forces of labor do not cause permanent brachial plexus injury, and that such injuries only result from physician applied traction, because the opinion has no scientific basis and is unreliable. "Scientific" knowledge, the Supreme Court has found, "represents a *process* for proposing and refining

theoretical explanations about the world that are subject to further testing and refinement." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786 (quoting Brief for American Association for the Advancement of Science *et al*. as *Amici Curiae* 7-8) (emphasis in original). "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Madrigal v. Mendoza*, 639 F.Supp.2d 1026 (Dist. Arizona 2009). In the instant case, Plaintiffs' experts are merely concluding that the presence of a permanent brachial plexus injury must mean there was excessive physician-applied traction. They do so without any evidence of excessive traction in the medical records and without any current study or test to support their theory that such injuries cannot happen in the absence of excessive physician-applied traction. Their opinions are not derived by scientific method.

The case of *Madrigal v. Mendoza*, 639 F.Supp.2d 1026 (Dist. Arizona 2009) is instructive. In that case, a federal district court held that the opinions of the plaintiffs' expert that improper traction was employed by a doctor and caused an infant's brachial plexus injury was not supported by scientific evidence and therefore was not reliable and inadmissible. The mother in that case had an ultrasound study at 36 weeks that estimated the baby's weight at 4,172 grams (9 pounds, 3 ounces). The mother was presented with options and chose a planned induction at 39 weeks. The delivery was complicated by the development of a shoulder dystocia, and after a number of maneuvers the delivering physician delivered the 10 pound, 10 ounce baby. At birth, the baby had a brachial plexus injury which the plaintiffs alleged was permanent. They brought suit alleging that the injury was the result of medical negligence during the

delivery. Specifically, they argued that the mother should have been offered a cesarean section, and that improper traction was used during delivery.

The court in *Madriga* found that there was "no question" that the plaintiffs' expert, who was board certified in Obstetrics and Gynecology, had the background and experience necessary for an expert witness. *Id.*, 639 F.Supp.2d at 1029. The court nevertheless determined that his opinions in that case did not pass muster under Fed. R. Evid. 702. The court noted that "[m]edical studies have demonstrated that shoulder dystocia and brachial plexus injuries are generally not predictable or preventable." *Madriga*, 639 F.Supp.2d at 1030. The court also noted that the American College of Obstetricians and Gynecologists ("ACOG"), "the leading professional group for women's health care providers in the United States," states that shoulder dystocia is "most often an unpredictable and unpreventable obstetric emergency." The court noted that the ACOG Practice Bulletin on Shoulder Dystocia also states that a significance proportion--34–47%--of brachial plexus injuries are not associated with shoulder dystocia; and that 4% occur after cesarean delivery. *Id.* The court acknowledged that fetal macrosomia and maternal diabetes increase the risk of shoulder dystocia, but noted that "[i]n one study, the presence of both diabetes and macrosomia accurately predicted only 55% of cases of shoulder dystocia." *Id.* The court also cited the ACOG bulletin for the fact that:

> [a] small, randomized trial of 273 patients with an ultrasound-estimated fetal weight of 4,000-4,500 g comparing labor induction with expectant management reported no significant difference in the rate of shoulder dystocia (3.7% versus 4.3%) or brachial plexus palsy (0% versus 1.4%).

*Id.* The court noted that other studies and literature reviews concur that "[a]lthough brachial plexus palsy is frequently associated with shoulder dystocia, evidence suggests that its occurrence may, in some instances, antedeate the time of delivery," and that "[t]o date, no management algorithm involving selective interventions based on estimates of fetal weight has demonstrated efficacy in reducing the incidence of either shoulder dystocia or brachial plexus injury." *Id.*

The plaintiffs' expert in *Madrigal* had opined that "improper traction was employed by [the delivering doctor] prior to the maneuvers, which ultimately produced delivery, and that this traction produced a brachial plexus injury." *Id.*, 639 F.Supp.2d at 1031. But the court noted that the expert did "not provide the basis for that opinion in his report," and that the expert's opinions were "not supported by the scientific evidence presented." *Id.* In particular, the court noted that the plaintiffs' expert's opinion:

> does not, however, comport with the evidence described above which shows brachial plexus injuries as occasionally occurring even in births by cesarean. And [plaintiffs' expert] gives no basis for his opinion that this birth is one where brachial plexus [injury] could not have occurred but for improper traction. This Court cannot accept expert opinions without being able to assess the basis behind them.

*Id.*

The same principles at play in *Madrigal* apply to the case at bar. Dr. Kozin acknowledged that he is not aware of any evidence from the materials he reviewed that anyone observed or attests to Dr. Murray having used any excessive traction during the

delivery of Aubree Lawrey. (Dep. of Kozin 73:15-20). Dr. Kozin acknowledged that, because he does not know the amount of endogenous force that can be generated by a mother during labor, he cannot say whether enough force can be generated to rupture the nerves of the brachial plexus during the labor process. (Dep. of Kozin 52:9-19, 53:8-13). Dr. Grunbaum acknowledged that temporary injuries to the posterior arm can occur in the absence of excessive physician-applied traction. (Dep. of Grunbaum 63:16-22). He admitted that he does not know what the mechanism for such injury is, and testified that he knows of no evidence other than anecdotal evidence to support his theory that permanent injuries cannot also occur in the posterior arm without excessive physician traction. (Dep. of Grunbaum 63:23-25, 77:14-18). Although both of Plaintiffs' experts acknowledge that temporary brachial plexus injuries can occur without excessive traction from the birth attendant, neither can provide an empirical explanation for their opinion that permanent injuries cannot likewise occur in the absence of physician-applied traction.

In this case, Plaintiffs' experts are looking at the result and concluding that the injury was caused by the delivering clinician—without any evidence of excessive traction in the medical records and without any current study or test to support their theory that such injuries cannot happen in the absence of excessive physician-applied traction. There is nothing to connect their explanations of *how* brachial plexus injuries occur (stretching of the nerves) with their opinions about *what caused* this particular injury to occur. By overlooking or choosing to ignore evidence that supports an

intrauterine-injury explanation in favor of adopting an explanation with no evidentiary support, Plaintiffs' experts are employing an unreliable methodology.

An additional and related basis for excluding Plaintiffs' experts' opinions is because they are speculative. It is well-settled that an expert should not be permitted to testify at trial when his opinions amount to nothing more than speculation. See *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001); *Weisgram v. Marley Co.*, 169 F.3d 514, 515 (8th Cir. 1999). As the Supreme Court has explained:

> Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt Transp.*, 243 F.3d at 444 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir.), cert. denied, 531 U.S. 979 (2000)). Therefore, as part of its gatekeeping function, a district court must preclude an expert when his conclusions or testimony are "mere speculation and pure conjecture." *Id.*

In this case, both of Plaintiffs' experts admit that temporary brachial plexus injuries can occur without physician traction, but both opine that permanent injuries cannot. Neither expert can provide a science-based explanation for this mysterious dividing line or articulate what the cut-off is. They just say that permanent injuries

cannot happen without physician-applied traction, and conveniently ignore the medical literature and case studies that contradict them. In other words, Plaintiffs' experts contend that their opinions are valid because they say they are. Such an explanation is the definition of speculation and should not be accepted by the Court. See, e.g., *Zenith Elec. Corp. v. WH-T Broad Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("[An expert] who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines the term."); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("A court is not obligated to admit testimony just because it is given by an expert.").

Given the foregoing, it is apparent that Plaintiffs' experts are merely speculating and not providing testimony or opinions that are grounded in scientific theory or method. Accordingly, their opinions should be excluded.

## II. AS AN ORTHOPEDIC SURGEON, PLAINTIFFS' EXPERT DR. KOZIN IS NOT QUALIFIED TO TESTIFY WITH REGARD TO THE ETIOLOGIES OF BRACHIAL PLEXUS BIRTH INJURIES AS THEY OCCUR DURING LABOR.

Rule 702 provides that a witness can be qualified as an expert by "knowledge, skill, experience, training, or education," and it is the trial court's responsibility "to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." Fed.R.Evid. 702; *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d 706, 715 (8th Cir.2001) (citation omitted). After completing this task, the trial court "must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule

702." *Wheeling Pittsburgh Steel Corp.,* 254 F.3d at 715 (citations omitted). A physician who is to give an expert opinion about the quality of care given by a defendant doctor must "make a substantial showing of qualification in the particular field of inquiry." *Mattke v. Deschamps*, 374 F.3d 667 (8th Cir. 2004).

In this case, Dr. Kozin admits that he is not an expert in obstetrics and does not understand the physiology of child labor. (Dep. of Kozin 19:19-22). Dr. Kozin has never written anything in the medical literature regarding his opinion that only lateral traction, as opposed to axial traction, can cause brachial plexus injury. (Dep. of Kozin 20:4-9). He admits that he does not have any expertise with regards to the movements that the fetus makes while traversing down the birth canal. (Dep. of Kozin 19:23-25, 20:1-3). He does not consider himself an expert on whether obstetrical forces and movements of the fetus in labor down the birth canal can widen the angle between the shoulder and the spine, and has never published or written an opinion on that subject. (Dep. of Kozin 22:11-22, 23:1-14). He admitted that his expert report in this case was actually authored by Plaintiffs' attorney, Kenneth Levine, and that he did not make any changes to the report that Mr. Levine sent him to sign. (Dep. of Kozin 29:17-25, 30:1-4). Dr. Kozin does not know the degree of variation in the tensile strength of nerves of the brachial plexus in different fetuses. (Dep. of Kozin 34:10-19). Dr. Kozin acknowledged that compression of the brachial plexus while a fetus is in utero can damage the nerve, but testified that he has "no idea" whether a brachial plexus that is compressed in utero without traction becomes more susceptible to injury during the normal traction of labor. (Dep. of Kozin 35:21-25, 36:1-19). He testified that he does not know, and is not

qualified to opine on, whether the traction that causes brachial plexus injuries can occur as a result of the endogenous force of the maternal propulsive effort with the shoulder impinged on the sacral promontory. (Dep. of Kozin 48:1-13).

Despite all of the above acknowledgements regarding Dr. Kozin's lack of expertise with regard to obstetrics and the physiology of labor, Dr. Kozin opines in his report that "the mother's maternal forces are very suspect as a cause of permanent brachial plexus injury" and "permanent brachial plexus injuries are not caused by those forces." (Doc. #54-4, pp. 5). Plaintiffs appear to be using Dr. Kozin to interject unfounded and unqualified obstetrical opinions in through the back door. In essence, Dr. Kozin is saying 'this kind of injury can only happen if a doctor pulls down really hard on a baby's head, but I have no opinion as to whether pulling down really hard on a baby's head falls below the standard of care because I'm not an expert in obstetrics.' Although Dr. Kozin professes that he has no opinion on the standard of care, his actual testimony as disclosed in his report exceeds the scope of his expertise, and renders his testimony unreliable under Rule 702.

## III. PLAINTIFFS' EXPERTS' THEORY THAT MATERNAL EXPULSIVE FORCES DO NOT CAUSE PERMANENT BRACHIAL PLEXUS INJURY, AND THAT SUCH INJURY IS ALWAYS THE RESULT OF PHYSICIAN-APPLIED TRACTION, DOES NOT FIT THE FACTS OR THE ISSUES IN THIS CASE AND THUS ADVANCES NO ISSUE IN THIS LITIGATION.

In addition to the factors espoused in *Daubert*, the Eighth Circuit considers other factors such as whether the expert ruled out alternative explanations and whether the expert connected the proposed testimony with the facts of the case. *Lauzon*, 270 F.3d at 687. In this case, Plaintiffs' experts' opinions are unreliable as a matter of law

because 1) they have not attempted to connect their proposed testimony with the facts of the case; 2) They never attempted to perform further investigation to confirm their theories; and 3) They have not ruled out alternative explanations. (Aff. of DeMott ¶¶ 8 - 11).

Dr. Kozin testified that he has not formed any conclusion as to whether the arm that was injured in this case was in the posterior or anterior position during delivery. (Dep. of Kozin 41:5-9). He has never written anything in the medical literature regarding his opinion that only lateral traction, as opposed to axial traction, can cause brachial plexus injury. (Dep. of Kozin 20:4-9). Dr. Grunebaum testified that the severity of the injury was the only evidence he could point to indicating excessive traction was used. (Dep. of Grunebaum 62:10-16). Dr. Grunebaum further testified that he knows of no evidence other than anecdotal evidence to support his theory that permanent injuries cannot occur in the posterior arm without excessive physician traction. (Dep. of Grunbaum 77:14-18).

Plaintiffs' experts have done neither independent testing nor performed independent study to validate their theory that the natural forces of labor cannot cause brachial plexus injury. They have done nothing to rule out the possibility that the stretch injury of the brachial plexus occurred as the child's posterior shoulder encountered the sacral promontory of the spine. Thus, Plaintiffs' experts' theory fails to advance the central issue of causation in this case.

DATED this 15th day of June, 2012.

KEARNEY CLINIC, P.C. and DAWN M. MURRAY, M.D., Defendants.

BY: *s/ Joseph M. Aldridge*
James A. Snowden, #13927
Joseph M. Aldridge, #23893
WOLFE, SNOWDEN, HURD, LUERS & AHL, LLP
Wells Fargo Center
1248 O Street, Suite 800
Lincoln, NE 68508
(402) 474-1507
(402) 474-3170 (fax)
jsnowden@wolfesnowden.com
jaldridge@wolfesnowden.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 15, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Christopher P. Welsh, James R. Welsh, and Kenneth Levine.

*s/Joseph M. Aldridge*
Joseph M. Aldridge